## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

STUDENTS FOR JUSTICE IN PALESTINE
AT THE UNIVERSITY OF SOUTH FLORIDA,

     *Plaintiff*,

v.                          Case No. 1:23cv281-MW/HTC

RAYMOND RODRIGUES, *et al*.,

     *Defendants*.

_____/

## THE BOARD OF GOVERNORS AND CHANCELLOR RODRIGUES' REPLY IN SUPPORT OF MOTION TO DISMISS

Defendants, Chancellor Raymond Rodrigues and the members of the Board of Governors of the State University System of Florida (collectively, the "Board of Governors" or "Board"), respectfully reply in support of their Motion to Dismiss (ECF No. 61).

**I.    Plaintiff cannot explain how the Board could enforce a memorandum against a student group.**

The use of the word "must" does not cloak correspondence in legal significance it otherwise lacks. Plaintiff's Reply[1] fixates on the "mandatory language" of the

---

[1] This Reply will refer to Plaintiff's Combined Reply in Support of a Preliminary Injunction and Opposition to Defendants' Motions to Dismiss (ECF No. 67) as "Plaintiff's Reply." Similarly, citations to ECF No. 60—the Board's Response

Chancellor's Memorandum: the single use of the word "must." ECF No. 67-1 at 2. Neither this language nor the Chancellor's signature elevates a memorandum to the status of a Board regulation, statute, executive order, or other binding, enforceable act. Word choice alone cannot compensate for a dearth of legal authority.

Plaintiff did not show that the Chancellor's Memorandum is binding on anyone. Nor does Plaintiff point to any legal mechanism by which the Chancellor's Memorandum could be "enforced" against Plaintiff, or even against the University. Any future action against the University by the Board is not based on fact, but on speculation, and would stem from a pre-existing legal framework—not a non-binding memorandum by the Chancellor.

To justify the flawed injunction it seeks, Plaintiff misconstrues the nature of the Chancellor's Memorandum, insisting that the Memorandum "remains in place today" and therefore must be "rescinded." ECF No. 67 at 16, 18, 19. A communication without legal effect is not "in place" and cannot be "rescinded." A rule or policy might be capable of repeal or rescission, but a memorandum is no more subject to rescission than a letter, a press release, an email, or a conversation. *See Rescind*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. To abrogate or cancel (a contract) unilaterally or by

---

to Plaintiff's Motion for Preliminary Injunction—are only to those portions of the Response that were incorporated by reference into the Board's Motion to Dismiss, *see* ECF No. 61 at 1–2. Because the Board's Reply is limited to those issues set forth in the Motion to Dismiss, this Reply cannot address the merits arguments raised in Plaintiff's Reply. Those arguments must wait for the hearing.

agreement. 2. To make void; to repeal or annul <rescind the legislation>. 3. *Parliamentary law*. To void, repeal, or nullify a main motion adopted earlier.").

Plaintiffs cite *Dombrowski v. Pfister*, 380 U.S. 479 (1965), and *Green Party of Tennessee v. Hargett*, 791 F.3d 684 (6th Cir. 2015), in support of their argument that the Board should be forced to rescind the Chancellor's Memorandum to ameliorate its alleged effects. Both of those cases involved state statutes and the state officials responsible for enforcing them. Of course, a statute can be repealed—just as it must be enacted in the first instance—and can also be enforced. Neither is true of a memorandum.

No statute or Board regulation generated the Chancellor's Memorandum, and no statute or regulation can accomplish its "rescission." What Plaintiff therefore demands is simply a second public statement disavowing the first. But again, Plaintiff cites no legal authority for the proposition that a public official can be enjoined to retract a public advocacy statement based on the subjective reaction of someone who disagrees or feels threatened, or that the proper role of Article III courts includes ordering public officials to issue retractions of their non-binding calls for action. *Cf. Kennedy v. Warren*, 66 F.4th 1199, 1208 (9th Cir. 2023) ("The letter's widespread dissemination may have put pressure on Amazon to act, but not in a way that *Bantam Books* prohibits. Generating public pressure to motivate others to change their behavior is a core part of public discourse, and [the constitution does not] require

legislators to refrain from such speech or advocacy.' In fact, any such right 'would stand the Constitution on its head' by cutting off political discourse." (citations omitted)).

## II. The Complaint did not raise a chilling effect as a basis for Plaintiff's First Amendment claim.

Plaintiff's Reply spills considerable ink on the Chancellor's Memorandum's purported chilling effect on Plaintiff's speech. But this is the first time Plaintiff raised a chilling effect as the injury giving rise to its First Amendment claim. "A party cannot amend a complaint by attaching documents to a response to a motion to dismiss, or by asserting new facts or theories in the response." *Clark v. Ocwen Loan Servicing, LLC*, 1:17-cv-03027, 2018 WL 1804349, at *3 n.6 (N.D. Ga. Jan. 18, 2018), *report and recommendation adopted*, 2018 WL 4471936 (N.D. Ga. Aug. 15, 2018). Thus, Plaintiff cannot avoid dismissal by raising a theory of standing for the first time in response to a motion to dismiss. *Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284–85 (11th Cir. 2007) (explaining that appellant could not advance a theory of standing to avoid dismissal unless it was articulated in the complaint); *see also Jiangmen Benlida Printed Circuit Co., Ltd. v. Circuitronix, LLC*, 21-60125-CIV, 2023 WL 6213698, at *4 (S.D. Fla. Sept. 25, 2023) ("Benlida neglected to mention any of these theories, or any facts supporting them, in its complaint. . . . [T]his failure is fatal to Benlida's ability to ward off summary judgment.").

The words "chill" or "chilling effect" do not appear in Plaintiff's Complaint. *See generally* ECF No. 1. Plaintiff's Motion for Preliminary Injunction uses the term "chilling" exactly once. ECF No. 39 at 17. None of the student declarations submitted by Plaintiff mentions self-censorship or a chilling effect on the students' or Plaintiff's speech or associational rights. *See* ECF No. 36. Instead, their own evidence boasts of Plaintiff's nearly 100% increase in social media followers since October, *id.* at 5, 10, 15, 20.

Plaintiff concludes the chill on its speech caused by the Chancellor's Memorandum is "very far from speculative," ECF No. 67 at 25, 27, but offers no allegations or evidence in support. Even at the dismissal stage, Plaintiff's claim cannot survive on mere conclusions without a plausible factual basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). There is no chilling-effect exception to *Iqbal*'s pleading requirements.

If Plaintiff intended to rely on a purported chilling effect on its First Amendment rights to sustain its claim and establish an Article III injury, it was required to say so in its Complaint. Because it did not, Plaintiff's argument that its chilled speech is sufficient to confer standing is inapposite and should be ignored.

Of course, even if Plaintiff could establish an objectively reasonable chilling effect, injury alone is not sufficient to confer standing or state a claim. Plaintiff's argument that the mere existence of the Memorandum is enough to satisfy Article III

is therefore incorrect. If this was enough to establish redressability or traceability, public officials would risk violating the First Amendment every time they made a public utterance that someone subjectively perceived as hostile. This stretches Article III too far.

## III.   The Board's oversight of the University system, including its general enforcement authority fin section 1008.322, does not establish a "credible threat" of enforcement against Plaintiff.

Plaintiff's reliance on the Board's oversight of universities does not create a credible threat that the Board can or will enforce the Memorandum against Plaintiff. Plaintiff offers no evidence or legal authority showing that the Board can deactivate a student group. Still, Plaintiff claims that an injunction would provide redress if it prohibited the Board from exercising its authority under section 1008.322 to "compel" the University to deactivate Plaintiff. But no such purely compulsory authority exists, and moreover, Plaintiff's argument that the Board would exercise its authority in any manner is wholly speculative.

To be sure, the Board oversees the State University System, and part of that oversight authority includes the enforcement tools set forth in section 1008.322. The Chancellor can investigate allegations of a *university's* noncompliance with state statute or Board regulation, can determine probable cause, and can report his findings to the Board at a publicly-noticed meeting. § 1008.322(3)(a), Fla. Stat. The Board can request information from universities, *id.* §1008.322(2), and, upon a report of probable

cause, can require a university to document compliance with the law or regulation at issue, *id.* § 1008.322(3)(a). If the university cannot document compliance, the Board can order the university to comply within a specified time frame. *Id.* § 1008.322(4). If the university still remains unwilling or unable to comply, the Board may initiate a number of actions in response: it may withhold certain funds, declare the university ineligible for certain grants, require periodic reporting on noncompliance, and report the university's noncompliance to the Legislature. *Id.* § 1008.322(5). Each of these actions can be directed only to a university, and only upon formal board action. No provision of section 1008.322 allows the Board to dictate how a university must discharge its operational and administrative functions—and especially not those functions that have been expressly delegated to the university, like oversight of student groups, *see* Fla. Bd. of Govs. Regul. 1.001(4).

Three critical limitations prevent Plaintiff from using these enforcement tools to create standing.

*First*, under section 1008.322, the Board of Governors' enforcement tools are available only to (i) remedy violations of state law or Board regulations, (ii) and only *by universities*—not violations of memoranda, and not violations by student groups.

*Second*, whether the Board ever proceeds under section 1008.322 to remedy some violation of law by the University is wholly speculative. Plaintiff has not identified what law or regulation the University would be suspected of violating, or

how; how the University would respond to such an allegation; what the outcome of the University's efforts to show compliance would be; what steps the University might take to achieve compliance; and in the case of continued non-compliance, what tools the Board would or would not employ in response.

It is anyone's guess whether these processes would ever start, or when—or what the outcome would be. Plaintiff's theory might be a fine premise for a Choose Your Own Adventure novel,[2] but it does not create a "credible threat" of enforcement, or a justiciable controversy under Article III.

*Third*, general enforcement authority cannot establish redressability in the absence of evidence that the defendant intends to, or has threatened to, exercise that authority against the plaintiff. *See* ECF No. 60 at 6–7, 15–17. Here, there is no evidence or allegation that the Board has threatened to use its general enforcement authority over the University to try to achieve deactivation. And as a matter of law, the Board's enforcement authority can never reach Plaintiff—only institutions. §§ 1008.322(3)–(5), Fla. Stat.; *cf. Falls v. DeSantis*, 4:22CV166-MW/MJF, 2023 WL 3568526, at *7 (N.D. Fla. May 19, 2023) ("[T]he likelihood that an injunction against the Board members would directly redress his free speech injury was merely

---

[2]*See Entm't Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051, 1056 (N.D. Ill. 2005), *aff'd*, 469 F.3d 641 (7th Cir. 2006) ("[T]hey also parallel popular books, such as the *Choose Your Own Adventure* series, which enable readers to make decisions about how the plot and characters will develop.").

speculative at the time given the Board's general authority to punish constituent institutions rather than individual professors."); *Link v. Diaz*, 4:21CV271-MW/MAF, 2023 WL 2984726, at \*4–5 (N.D. Fla. Apr. 17, 2023) ("Plaintiffs point to no law or rule that specifically ties any general supervisory or enforcement authority over the institutions within the Boards' jurisdiction to enforcement of the recording provision against individuals in this case. This is simply not sufficient to establish traceability for standing purposes."); *Falls v. DeSantis*, 609 F. Supp. 3d 1273, 1283 (N.D. Fla. 2022) (finding lack of traceability when plaintiff relied only on defendant board's general statutory enforcement authority).

Plaintiff tries to bridge this gap with distinguishable cases. Plaintiff cites *Bennett v. Spear*, 520 U.S. 154 (1997), for the proposition that the University's future actions against Plaintiff would be traceable to the Board and the Governor and redressable by an injunction against them. ECF No. 67 at 32–33. The Court in *Bennett* held that the Federal Fish and Wildlife Service ("FWS") was a proper defendant even though the Bureau of Reclamation ("Bureau") would take the ultimate action that harmed the plaintiff. *Id.* at 167. Any similarity to this case is superficial, because the reason for the Court's conclusion is absent here.

In *Bennett*, the Bureau's actions were governed by a statutorily-mandated report, called a "Biological Opinion," issued by the FWS. *Id.* at 167–70. The Biological Opinion "alters the legal regime to which [Bureau] action is subject," and

if the Bureau wished to deviate from the dictates of the Biological Opinion, it must "articulate the reasons" why—and a misstep could result criminal and civil penalties. *Id.* at 169–70. Setting aside the Biological Opinion would therefore likely redress the plaintiff's injuries. *Id.* at 171. The defendant in *Bennett* had specific legal authority to determine the actions that the Bureau would ultimately take, and its Biological Opinions were "virtually determinative" of the plaintiff's fate. *Id.* at 170.

So too in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), which Plaintiff relies on to support a First Amendment injury arising from indirect pressure or coercion. In *Bantam*, the defendant commission did not itself arrest and prosecute booksellers, but was duty-bound to report booksellers to police and the Attorney General if found carrying unsuitable publications, and threatened to carry out that duty in communications directly to the plaintiffs. *Id.* at 637–38. The commission was created for the sole purpose of rooting out and censoring disfavored books and publishers, and its charge was codified in state law. *Id.* at 633–34, 637–38. The Court also emphasized the lack of procedural safeguards for publishers or opportunity for review of the commission's actions, which accomplished an end-run around the process and burdens required for criminal prosecutions for obscenity. *Id.* at 639–40.

Plaintiff also relies on *Speech First v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), which involved a challenge to a university's facially content-based speech code. The speech code applied to students, and the defendants were university

officials. *Id.* at 1114–18. It comes as no surprise that university officials were proper defendants in a case involving the university's own speech code.

In deciding *Speech First*, the Eleventh Circuit observed that indirect pressure can sometimes constitute an actionable chill on First Amendment rights, even if the defendant lacks the formal power to punish, citing *Bantam Books* and *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003).[3] *Id.* at 1122–24. But the context of this observation matters. The Court's analysis stemmed from its disagreement with the district court's conclusion that the plaintiff lacked standing to challenge one part of the speech code because the internal committee charged with monitoring that provision lacked independent authority to punish students. *Id.* Instead, the committee could intake complaints and refer them to other university actors (including university police) to impose punishment. *Id.* The defendant had ultimate enforcement authority, the committee was created by the university, and the university's speech code was

---

[3] *Okwedy* is distinguishable for the same simple reason that it involved a direct threat by the defendant against the billboard company that carried the plaintiff's message. In *Okwedy*, the Borough President's threat was explicitly critical of the plaintiff's speech as "unnecessarily confrontational and offensive" and "not welcome," and implied negative economic consequences to the billboard company if not removed. 333 F.3d at 341–42. In contrast, the Chancellor's memorandum says no such thing. It does not say that messages supportive of Palestinian rights and freedom are unwelcome, and did not threaten retaliation against the University if the University does not deactivate Plaintiff. Instead, the Memorandum is clearly concerned that SJP's network of chapters considers itself part of a movement that engages in terrorist attacks, and thus emphasizes the necessity for complying with "Florida state statutes and university policies" and "providing a safe environment" on campuses. ECF No. 67-1.

enforceable directly against university students. *Id.* at 1114–18, 1122–24. Enforcement of the speech code did not lie in a third party's hands.

Similar to *Bantam Books*, the Court in *Speech First* placed importance on the purpose for which the committee was created, and its codified obligation to refer speech-code violations to administrators and law enforcement. *Id.* at 1122–24. Unlike this case, the defendant in *Speech First* had direct authority over students, and the challenged action was specifically directed to students.

Finally, Plaintiff fails to show that a credible threat of enforcement exists vis-à-vis the University—the entity Plaintiff concedes is ultimately responsible for accomplishing deactivation. Plaintiff does not allege that the University intends to deactivate it or has started the process of deactivation. Plaintiff offers no rebuttal to the Board's argument that the University's robust due-process procedures (including notice, a fair hearing, and appeal rights) must be exhausted before deactivation is accomplished—or not—by the University. *See, e.g.,* Regul. USF6.0021, *General Student Code of Conduct*, at 15–28.[4]

## IV.  Plaintiff's cursory response to the Board's ripeness argument is unconvincing.

Plaintiff hardly addresses the Board's analysis of the Eleventh Circuit's ripeness inquiry or its application to this case. Plaintiff concludes that no factual development

---

[4] A copy of USF Regulation 6.0021 is attached for ease of reference.

is needed because this dispute is purely legal, but says nothing more. *See* ECF No. 67 at 38. Plaintiff offers no rebuttal to the Board's concrete explanation of why further factual development is necessary to avoid premature federal adjudication before state administrative processes have even begun. *See* ECF No. 60 at 17–20. Consistent with Eleventh Circuit precedent cited in the Board's Motion, abstention on ripeness grounds will provide this Court the opportunity to adjudicate a fully-formed dispute in the future—and between the correct parties—should it ever arise.

In all, Plaintiff's response to the Board's ripeness argument is a summation of Plaintiff's response to the Board's standing arguments. *See* ECF No. 67 at 36–38. Plaintiff reasserts its insistence that the Memorandum is legally enforceable,[5] and advances its new argument that Plaintiff has experienced a chilling effect as a result. Neither establishes that Plaintiff's claim is "sufficiently mature," is presently "fit for adjudication," and does not "require speculation about contingent future events," *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001); *accord Elend v. Basham*, 471 F.3d 1199, 1211 (11th Cir. 2006).

---

[5] Even this endeavor is unsuccessful. Plaintiff plucks a quote from *Wollschlaeger* that merely observed that courts are hesitant to interpret *state statutes* as merely "hortatory." ECF No. 67 at 36 (quoting 848 F.3d at 1305). The Board need not belabor further the patent differences between a state statute and a memorandum.

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that the foregoing reply contains 3,135 words and therefore complies with the word limitation requirements in Local Rule 7.1(F).

Dated January 23, 2024.                    Respectfully submitted,


<u>/s/ *Ashley H. Lukis*</u>
Ashley H. Lukis (FBN 106391)
James T. Moore, Jr. (FBN 70023)
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
Telephone: 850-577-9090
ashley.lukis@gray-robinson.com
tim.moore@gray-robinson.com
andy.bardos@gray-robinson.com
*Attorneys for Defendants, Florida*
*Board of Governors of the State*
*University System and Chancellor*
*Rodrigues*

14